UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODERICO FILADELFO PEREZ-PEREZ,

                    Petitioner,                          Case Number 20-10833

v.                                                          Honorable David M. Lawson

REBECCA ADDUCCI, Detroit District
Director, United States Immigration and
Customs Enforcement, MATTHEW T. ALBENCE,
Director, United States Immigration and
Customs Enforcement, KEVIN MCALEENAN,
Secretary of the United States Department of
Homeland Security, and WILLIAM P. BARR,
United States Attorney General.

                    Respondents.

_____/

## OPINION AND ORDER GRANTING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER AS PRELIMINARY INJUNCTION

Petitioner Roderico Filadelfo Perez-Perez filed an emergency petition for a writ of habeas corpus on March 31, 2020, and two weeks later filed an emergency motion for a temporary restraining order. Perez-Perez is a 41-year-old native and citizen of Guatemala who currently is detained by the United States Immigration Customs and Enforcement Agency ("ICE") at the Monroe County Jail Dormitory pending his removal under 8 U.S.C. § 1182(a) for being unlawfully present in the United States. He suffers from hypertension, which is one of the comorbidities identified by the Centers for Disease Control and Prevention (CDC) that elevates the risk of complications from the rapidly-spreading novel coronavirus, and he asks for immediate release.

Since the case was filed, the Immigration Court in Detroit granted his application for cancelation of removal and adjustment of status to that of legal permanent resident. The Immigration Court found that he had a good moral character, and that in light of the coronavirus pandemic, it would be an "exceptional and extremely unusual hardship" to his American children

if he were deported.  Yet, the government has not relented; it has appealed the decision to the Board of Immigration Appeals (BIA) and refuses to release Perez-Perez, even though a nurse who works four days per week at the Monroe County Jail Dormitory tested positive for COVID-19.

The relevant factors the Court must balance when faced with a request for preliminary injunctive relief weigh in favor of Perez-Perez.  The motion will be granted, and his release is ordered, subject to a 14-day quarantine requirement.

I.

Perez-Perez has lived in the United States for at least twenty years.  He has three children, two of whom are U.S. citizens (24 and 17 years old), and one is legally present under the Deferred Action for Childhood Arrivals (DACA) policy (19 years old).

On December 18, 2019, ICE initiated removal proceedings against Perez-Perez, charging him as removable under 8 U.S.C. § 1182(a)(6)(A)(i) for being present in the United States without being admitted or paroled.  ICE detained Perez-Perez while his removal was pending.

At a hearing before the Immigration Court on January 8, 2020, Perez-Perez admitted that his presence in the United States was unlawful and conceded that he was removable.  The Immigration Court then denied the petitioner's request for bond, finding that he was a danger to his community due to his criminal history, which consists of minor traffic infractions, with one exception: a conviction for drunken driving on December 10, 2019.

Perez-Perez applied for cancellation of removal under 8 U.S.C. § 1229b(b), and a hearing was set for June 15, 2020.  The Immigration Court then advanced the hearing to April 24, 2020, at which time Immigration Judge Jennifer Gorland granted relief and adjusted Perez-Perez's status to lawful permanent resident.  The government appealed that decision to the BIA.  The petitioner remains in ICE custody at the Monroe County Jail Dormitory in Monroe, Michigan.

Perez-Perez contends that he suffers from hypertension, which places him at a heightened risk of developing severe complications should he contract COVID-19.  In a declaration dated April 13, 2020, he stated, "I have a pre-existing medical condition.  Less than a year ago I was diagnosed with having high blood pressure.  I sought medical care at a clinic called Covenant, located on Michigan Ave in Detroit, MI, for a high fever and was informed that I had high blood pressure."  Medical personnel failed to diagnose that condition when Perez-Perez underwent an initial medical assessment at the Monroe County Jail, and no one has prescribed hypertension medication for him.

In his petition for habeas corpus relief, the petitioner seeks immediate release.  After a nurse at the Monroe County Jail Dormitory tested positive for COVID-19, the petitioner's request took on new urgency, and he moved for a temporary restraining order and served notice on the government.

## II.

Before turning to the merits of the motion, the government's challenge to subject matter jurisdiction must be addressed.  The government contends that 8 U.S.C. § 1226(e) ousts the Court's authority to adjudicate Perez-Perez's release petition, because the decision by the Immigration Judge to deny bond was a non-reviewable discretionary call.  Section 1226 gives the Attorney General the discretion to release or parole an alien who is subject to removal.  8 U.S.C. § 1226(a)(2).  And "[n]o court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole."  *Id.* § 1226(e).

An Immigration Judge denied bond to Perez-Perez on January 8, 2020.  But since then, Immigration Judge Gorland granted his petition for cancellation of removal and ordered that he be

"issued all appropriate documents necessary to give effect to [her] order."  The government states that because it appealed, the Immigration Court's order is not a final order.  But there is not much left to the underpinnings of the discretionary decision to detain the petitioner.

Moreover, although it is true that section 1226(e) prevents a federal court from reviewing an immigration judge's discretionary bond determination, it "does not limit habeas jurisdiction over constitutional claims or questions of law."  *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011).  In *Demore v. Kim*, 538 U.S. 510, 516-17 (2003), the Supreme Court held that section 1226(e) does not strip a district court of its traditional habeas jurisdiction, "bar constitutional challenge[s]," or preclude a district court from addressing a habeas petition "challeng[ing] the statutory framework that permits [the petitioner's detention] without bail."  *See also Al–Siddiqi v. Achim*, 531 F.3d 490, 494 (7th Cir. 2008) (holding that § 1226(e) "does not deprive us of our authority to review statutory and constitutional challenges"); *Saint Fort v. Ashcroft*, 329 F.3d 191, 200 (1st Cir. 2003) (noting that *Demore* "read the jurisdiction-limiting provision in § 1226(e) as applying only to review of the Attorney General's discretionary judgment"); *Sierra v. INS,* 258 F.3d 1213, 1217–18 (10th Cir. 2001) (holding, before *Demore* was decided, that "§ 1226(e) does not 'speak[ ] with sufficient clarity to bar jurisdiction pursuant to the general habeas statute'" (alterations in original) (quoting *INS v. St. Cyr,* 533 U.S. 289, 313 (2001))).

And district courts facing similar arguments in the COVID-19 context held that section 1226(e) did not strip them of jurisdiction to hear constitutional claims or questions of law arising from petitions for writs of habeas corpus.  *See Malam v. Adducci*, ---F. Supp. 3d---, 2020 WL 1672662, at *5 (E.D. Mich. April 5, 2020) (Levy, J) (concluding that section "1226(e) does not prevent this Court from exercising jurisdiction");  *Perez v. Wolf*, 2020 WL 1865303, at *4 (N.D. Cal. April 14, 2020) (same); *Monterosa v. Decker*, 2020 WL 1847771, at *4 (S.D.N.Y. April 11,

2020) (same).

Section 1226(e) does not bar the petitioner's request for relief here.

III.

Although the petitioner styled his motion as one for a temporary restraining order, he gave notice to the government and did not seek a ruling before the government could respond. His request should be characterized more properly as a motion for a preliminary injunction. Federal Rule of Civil Procedure 65 governs both. A temporary restraining order (TRO) may be issued without notice to the opponent and is meant to preserve the status quo until a court can make a reasoned resolution of a dispute. Fed. R. Civ. P. 65(b)(1); *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 226 (6th Cir. 1996). TROs are of a short duration and usually terminate with a ruling on a preliminary injunction. *Workman v. Bredesen,* 486 F.3d 896, 922 (6th Cir. 2007); Fed. R. Civ. P. 65(b). Here, because the defendants are on notice, the Court will treat the petitioner's motion as one for a preliminary injunction rather than a motion for a temporary restraining order. This linguistic difference is largely academic as the same factors apply to both. *See Ohio Republican Party v. Brunner,* 543 F.3d 357, 362 (6th Cir. 2008).

The petitioner bears the burden of demonstrating entitlement to injunctive relief. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Generally, courts consider four factors in determining whether to grant a preliminary injunction: "(1) whether the movant has demonstrated a substantial likelihood of success on the merits, (2) whether the movant will suffer irreparable injury absent injunction, (3) whether a preliminary injunction would cause substantial harm to others, and (4) whether the public interest will be served by an injunction." *Flight Options, LLC v. Int'l Bhd. of Teamsters, Local 1108*, 863 F.3d 529, 540 (6th Cir. 2017) (citing *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)). "These factors are

not prerequisites, but are factors that are to be balanced against each other." *Overstreet*, 305 F.3d at 573.

### A. Likelihood of Success

The government argues that Perez-Perez can't win because a writ of habeas corpus is not the proper vehicle for a challenge to conditions of confinement.  The Court rejected an identical argument in *Awshana v. Adducci*, --- F. Supp. 3d ---, No. 20-10699, 2020 WL 1808906 at *1-2 (E.D. Mich. April 9, 2020), where the petitioners sought a writ under 28 U.S.C. § 2241.  The critical feature that distinguishes this case from a more traditional lawsuit by a detainee who alleges poor treatment during confinement is that Perez-Perez is seeking release as the *only* remedy that will vindicate his rights under the Due Process Clause.  As in *Awshana*, he "allege[s] that [his] continued detention violates [his] constitutional right under the Fifth Amendment, which forbids depriving a person of life, liberty, or property without due process of law.  [He] contend[s] that [his] continued detention will compromise [his] health and may kill [him]." *Id.* at *2.  He is entitled to advance his claim — and seek release from custody — under section 2241.

The basis of Perez-Perez's claim is a well-accepted premise: "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general wellbeing." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citation omitted).  He says that the defendants cannot meet that obligation when a highly contagious virus is introduced into the close confinement that is inherent in a custodial environment.  This is not a novel argument.  In the immigration context, courts have released individuals who fell within one of the CDC's high-risk categories for complications from COVID-19, or who were housed in detention facilities with confirmed cases, or both. *Jones v. Wolf,* No. 20-361, 2020 WL 1643857 (W.D.N.Y. Apr. 2, 2020) (granting relief

for detainees with chronic medical conditions held in a detention facility with no confirmed COVID-19 cases); *Basank v. Decker,* No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); (granting relief for detainees with chronic medical conditions held in a facility with confirmed cases of COVID-19); *Coronel v. Decker*, --- F. Supp. 3d ---, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) (same); *Malam v. Adducci*, --- F. Supp. 3d ---, 2020 WL 1672662, at *5 (E.D. Mich. April 5, 2020) (granting relief for petitioner in high-risk category but held in facility with no confirmed cases); *Zaya v. Adducci*, No. 20-10921, WL 1903172 (E.D. Mich. April 18, 2020) (same).

Perez-Perez argues that his continued detention during the coronavirus pandemic violates his substantive right to due process guaranteed by the Fifth Amendment to the United States Constitution because it jeopardizes his health and medical wellbeing.  The Due Process Clause prohibits the federal government from depriving any "person . . . of . . . liberty without due process of law."  U.S. Const. amend. V.  "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S.678, 690 (2001).  The protection applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."  *Id*. at 693.

The government has an obligation to furnish appropriate medical care for both convicted defendants and detainees alike.  For convicted defendants, that obligation is established by the Eighth Amendment.  *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)); *see also Helling*, 509 U.S. at 31.  For detainees, whose rights include protections that are at least as substantial as the Eighth Amendment protections available to a convicted prisoner, *Jones v. Blanas*, 393 F.3d 918, 933-34 (9th Cir. 2004) (holding that civil

detainees are entitled to superior conditions of confinement than prisoners and pretrial detainees), the Due Process Clause sets the standard, *see City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). Nonetheless, claims relating to health concerns by detainees are analyzed using an Eighth-Amendment, deliberate-indifference framework. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001).

That framework calls for proof that detention officials were deliberately indifferent to a substantial risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994). The applicable test has two elements. *Id*. at 834. First, the petitioner must demonstrate that the constitutional deprivation was "objectively, 'sufficiently serious.'" *Ibid*. (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Second, he must demonstrate that the detention official had a "sufficiently culpable state of mind." *Ibid*. This element can be proven by circumstantial evidence from which the fact finder can conclude that the state actor perceived the risk, *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001), or "from the very fact that the risk was obvious." *Terrance v. Northville Reg'l Psychiatric Hospital*, 286 F.3d 834, 843 (6th Cir. 2002).

In *Helling v. McKinney*, the Supreme Court held that a prisoner could state a claim under the Eighth Amendment by alleging that officials "exposed him to levels of [environmental tobacco smoke] that pose[d] an unreasonable risk of serious damage to his future health." 509 U.S. at 35. To satisfy the objective prong, the plaintiff had to show both that he was "being exposed to unreasonably high levels of [environmental tobacco smoke]" and that "society consider[ed] the risk that the prisoner complain[ed] of to be so grave that it violate[d] contemporary standards of decency to expose anyone unwillingly to such a risk." *Id*. at 35, 36 (emphasis in original). The plaintiff must produce "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood [of] injury." *Id*. at 36. To succeed on the subjective prong, the

plaintiff had to show that "the prison authorities' current attitude and conduct" amounted to deliberate indifference.  *Ibid*.

However, "a remedy for unsafe conditions need not await a tragic event," and the plaintiff need not allege present harm to succeed on an unconstitutional-conditions claim.  *Id*. at 33.  In *Helling*, the Court rejected the government's argument that the plaintiff's claim was not cognizable because he had not alleged any present harm.  The Court explained that the government may not "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year."  *Ibid*.  The Court noted some examples of circumstances where inmates may obtain injunctive relief to remedy life-threatening conditions even though "nothing yet had happened to them."  *Ibid*.  One example was the "exposure of inmates to serious, communicable disease [even if the] inmate shows no serious current symptoms."  *Ibid*.

No one can deny that the health risks caused by the pandemic are grave.  Objectively, the health risks posed by COVID-19 are abundantly clear.  The novel coronavirus (COVID-19) is a respiratory disease that can result in serious illness or death.  It is caused by a new strain of coronavirus not previously identified in humans, and easily spreads from person to person.  There is currently no approved vaccine or antiviral treatment for this disease.  Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, estimated that between 100,000 and 240,000 people in the United States will die from COVID-19 related complications.  Michael D. Shear *et al.*, Coronavirus May Kill 100,000 to 240,000 in U.S. Despite Actions, Officials Say, N.Y. Times, Mar. 31, 2020, https://www.nytimes.com/2020/03/31/us/ politics/coronavirus-death-toll-united-states.html.

The Centers for Disease Control and Prevention (CDC) have advised that "[p]eople aged 65 years and older" may be at higher risk for severe illness from COVID-19.  People Who Are at

Higher Risk for Severe Illness, Centers for Disease Control and Prevention (Mar. 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The CDC also has identified persons with certain medical conditions as being at high risk, including those with "serious heart conditions." *Ibid.* That includes "heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension." *Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, https://www.cdc.gov/ coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 8, 2020).

On March 23, 2020, the CDC issued further guidance acknowledging that detention facilities "present [] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. "The CDC noted that many detention conditions create a heightened risk [for] detainees. These include: low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing)." *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *2 (E.D. Mich. Mar. 27, 2020).

Perez-Perez contends that he is particularly susceptible to COVID-19-related complications as a 41-year-old man with hypertension. The government responds that Perez-Perez did not adequately demonstrate that he suffers from chronic hypertension, and that hypertension is not a "high-risk" medical condition as defined by the CDC.

The second argument can be dismissed easily.  As noted above, the CDC actually does list hypertension as a risk factor, albeit the pulmonary variety.  And a study of the COVID-19 data from Wuhan, China revealed that individuals with hypertension face about a 6% rate of death, a rate that is about 3.5% higher than otherwise healthy individuals and comparable with death rates of people suffering from diabetes (7.3%) and respiratory disease (6.3%).  Zunyou Wu & Jennifer M. McGoogan, *Characteristics of and Important Lessons From the Coronavirus Disease 2019 (COVID-19) Outbreak in China – Summary of a Report of 72314 Cases From the Chinese Center for Disease Control and Prevention*, JAMA Network, https://jamanetwork.com/journals/jama/fullarticle/2762130; *see also What people with high blood pressure need to know about COVID-19*, American Heart Association, https://newsroom.heart.org/news/what-people-with-high-blood-pressure-need-to-know-about-covid-19 (ECF No. 11-6).  In a similar case, the court rejected the same argument presented by the government.  *Fofana v. Albence*, No. 10-10869, 2020 WL 1873307, at *9 (E.D. Mich. April 15, 2020) (rejecting argument that hypertension does not significantly increase an individual's susceptibility to severe COVID-19-related complications).  The court emphasized that a "CDC study of hospitalization rates reported on April 8, 2020 revealed that 74% of hospitalized patients were aged 50 years old or older, 54.4% were male and 49.7% had hypertension."  *Ibid*. (citing Centers for Disease Control, Morbidity and Mortality Weekly Report (April 8, 2020*), Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 – COVID-NET, 14 States, March 1–30, 2020*, https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6915e3-H.pdf.).

Perez-Perez's diagnosis of hypertension is not documented by medical records.  The only evidence of hypertension comes from his affidavit, which states that he "was diagnosed with having high blood pressure" "less than a year ago" at a "clinic called Covenant, located . . . in

Detroit, MI," that he visited to treat a "high fever." Perez Aff., ECF No. 11-2, PageID.411.  It still is a factor worth considering.

Although he appears healthy, Perez-Perez is housed in a manner that increases his risk of contracting COVID-19.  Although the Monroe County Jail stopped accepting new detainees and is operating at about half capacity, 31 inmates are confined to a single housing unit.  "This violates recommended guidelines to socially distance with at least six feet distance between people and for no more than ten people to gather in one space." *Fofana,* No. 10-10869, 2020 WL 1873307, at *9 (citing *Awshana*, 2020 WL 1808906 at *8).  Although the Monroe County Jail apparently increased cleaning, detainees allegedly share toilets, sinks, and showers without disinfection between each use. ECF No. 1, PageID.25.

The recent aggravating fact is the defendants' disclosure that a nurse that had been assigned to the Monroe County Jail Dormitory tested positive for COVID-19.  The nurse last worked at the facility on April 14, 2020, and has been on leave since then.  She is normally assigned to work in the dormitory where the petitioner is housed from 7:00 p.m. until 9:30 p.m., four days per week.  She did not have contact with Perez-Perez on April 14, but she did administer medications to other inmates in that unit then.

And that may well be the tip of the iceberg.  As the *Fofana* court pointed out, the government "is silent as to how many, if any, detainees have been tested for COVID-19" in the Monroe County Jail.  *Fofana,* No. 10-10869, 2020 WL 1873307, at *9.  The Michigan Department of Corrections "has only tested 707 inmates, with 454 testing positive for the virus, and a total inmate population of more than 40,000." *Ibid.*  With a lengthy, symptom-less incubation period of up to 14 days, the government's assurance that Monroe County Jail has no other confirmed cases is certainly no guarantee that the facility is free of the virus.  And as of May 8, 2020, Monroe

County has reported 383 total cases of COVID-19 and 16 deaths.  *See* Coronavirus, Michigan.Gov, https://www.michigan.gov/coronavirus/0,9753,7-406-98163-520743--,00.html.

To satisfy the subjective element of his claim, the petitioner must demonstrate that the government subjected him to objectively poor confinement conditions with deliberate indifference to his health and safety.  *Farmer*, 511 U.S. at 834.  There is no doubt that the respondents are aware of the grave threat posed by the pandemic and the exacerbated risk caused by the close quarters of the detention facilities.  *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/           correction-detention/guidance-correctional-detention.html (last visited May 8, 2020) (explaining that measures ordered by the CDC to reduce person-to-person contact present unique challenges for prisons and detention facilities, because "[i]ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced").

Subjectively, therefore it appears that the defendants are willing to house immigration detainees in a manner that increases the risk of infection.  That is not to say that the government has not taken commendable steps to stem the spread of the pandemic.  Following CDC guidance, Monroe County Jail staff assess detainees for fever and respiratory illness during intake medical screenings and ask about any possible exposure to the virus.   The government says that it houses those with confirmed exposure in separate cohorts with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill detainee).  And the government places detainees who present with COVID-19 symptoms in isolation where they are tested and treated if necessary.

However, while these measures are certainly commendable, "the fact is that none of the

steps [taken] . . . includes the 'social distancing measures recommended — especially for high-risk individuals — by the CDC . . ." *Jones*, 2020 WL 1643857, at \*10 (W.D.N.Y.).  The petitioner also is housed in a manner that increases his risk of exposure to the coronavirus.  He is held in a unit with 30 other detainees, confined in dorm-style housing.  Government experts agree that such a communal style of living can increase the infection rate.  *See Former ICE Director: Release Immigrants from Detention or COVID-19 Will Spread Like Wildfire Inside*, Democracy Now (Mar. 23, 2020);  https://www.democracynow.org/2020/3/23/ice_dentention_centers_covid_19; *FAQs for administrators, staff, people who are incarcerated, families*, Ctrs. for Disease Control and Prevention (Mar. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html.  And the government's record on testing inmates is anemic, providing tests only to those that exhibit symptoms.

Perez-Perez has satisfied the objective and subjective elements of a deliberate indifference claim.  But that does not necessarily mean that he is entitled to release under 28 U.S.C. § 2241.  The premise of this habeas corpus petition is that the conditions of confinement in the ICE detention facility are so intolerable because of the risk of contracting COVID-19 that release is the only remedy.  The cases decided during the pandemic hold that generalized allegations are not sufficient to justify that relief.  If they were, then all inmates would be entitled to release until the pandemic subsides.

A limiting principle can, however, can be found in the Due Process Clause itself, and the manner of its application.  The seminal case dealing with the constitutionality of conditions of confinement of non-convicted detainees is *Bell v. Wolfish,* 441 U.S. 520 (1979).  There, the Supreme Court held that such claims are governed by the Due Process Clause, a proposition that is now well accepted.  *See*, *e.g.*, *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir. 2008)

-14-

(reiterating that when a conditions-of-confinement claim "is asserted on behalf of a pre-trial detainee, the Due Process Clause . . . is the proper starting point").  But the Court also emphasized that those constitutional rights implicated by conditions of confinement, when analyzed for pretrial detainees under the Due Process Clause, must be balanced against the "Government['s] . . . legitimate interests that stem from its need to manage the facility in which the individual is detained."  *Bell*, 441 U.S. at 540.  Courts, therefore, must strike a balance "between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.* at 546 (quoting *Wolff v. McDonell*, 418 U.S. 539, 556 (1974)).  In striking that balance, courts must give great deference to the custodians "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *id.* at 547, lest courts become "enmeshed in the minutiae of prison operations." *Id.* at 562.

The "institutional interest" here is ICE's interest in continuing the detention of those removable aliens whom the Secretary determines "to be a risk to the community or unlikely to comply with the order of removal."  8 U.S.C. § 1231(a)(6).  When considering the remedy of a complete release from detention (albeit with conditions for supervision), the Court must strike a balance between the gravity of the risk of contracting COVID-19 (with uncertain outcomes for recovery and a path that could lead to death) with the danger to the public that could result from releasing the petitioners into the community.  "When striking [that] balance between ICE's institutional need for continued detention and the petitioners' legitimate concerns over an unreasonable risk of serious damage to their future health, it is fair to require the petitioners to articulate something more than a generalized fear of exposure to disease in a detention facility. That only makes sense, since 'the requirements of due process are fluid and fact dependent.'"

*Awshana*, 2020 WL 1808906, at *13 (quoting *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015)).

That balance plainly favors Perez-Perez. He has not been determined to be a flight risk. He has substantial ties to the community. And his criminal record consists of a drunken driving conviction of recent vintage and other moving and non-moving traffic violations. Drinking and driving is dangerous. But the petitioner says that he was enrolled in a program to address his drinking. And the Immigration Court necessarily found that he "has been a person of good moral character" for the preceding ten years. *See* 8 U.S.C. § 1229b(b)(1)(B). When held up against the risk of severe infection and, possibly, death, the government's minimal institutional interest does not outweigh the remedy of release.

The petitioner, therefore, has demonstrated likely success on the merits.

## B. Irreparable Injury

The petitioner must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). He must show that irreparable harm is "both certain and immediate, rather than speculative or theoretical." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). The "denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet*, 305 F.3d at 578; *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed").

The petitioner's unnecessary exposure to COVID-19 provides a basis to find that he will suffer irreparable injury unless he is immediately released. In *Thakker v. Doll*, --- F. Supp. 3d --, 2020 WL 1671563, at *3 (M.D. Pa. April 15, 2020), the court released more than ten immigrant

-16-

detainees, including several in their fifties with underlying health conditions like high blood pressure and diabetes.  The court reasoned that "[a]t this point, it is not a matter of *if* COVID-19 will enter Pennsylvania prisons, but *when* it is finally detected therein."  *Ibid.*  "There can be no injury more irreparable" than "lasting illness or death."  *Ibid.*  With evidence that a nurse who worked in the petitioner's dormitory-style unit tested positive for the virus within the last two weeks, this factor favors the petitioner.

### C.  Harm to Others & Public Interest

"When the government opposes the issuance of a temporary restraining order, as Respondents do here, the final two factors — the balance of equities and the public interest — merge, because 'the government's interest is the public interest.'"  *Malam*, 2020 WL 1672662, at *5 (quoting *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009))).

The public interest factor favors the petitioner's release.  He may face irreparable injuries to his constitutional rights and health.  And "it is always in the public interest to prevent the violation of a party's constitutional rights."  *G & V Lounge Inc. v. Mich. Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir. 1994).

Society benefits by stemming the proliferation of COVID-19, thereby "flattening the curve," preventing strain on medical centers and hospitals, and ultimately reducing death or long-term injury from COVID-19-related lung damage*. See Thakker*, 2020 WL 1671563, at *3 ("Efforts to stop the spread of COVID-19 and promote public health are clearly in the public's best interest"); *Fofana,* No. 10-10869, 2020 WL 1873307, at *10 (same); *see also Neinast v. Bd. Of Trustees*, 346 F.3d 585, 592 (6th Cir. 2003) (recognizing public health and safety as legitimate government interests).

The government argues that the Court should defer to the Attorney General's decision to detain him under 8 U.S.C. § 1226(a)(1) and the Immigration Court's denial of his bond request under 8 C.F.R. § 236.1(c)(8) due to his extensive criminal history.  But Perez-Perez's criminal history hardly is "extensive."  And the bond denial is undercut by the finding that he is "of good moral character" and his removal is cancelled.  No one has suggested that the petitioner poses a danger of increasing violent crime or drug-related activity.  And the petitioner is not a flight risk. He has lived and worked in the United States for at least twenty years and has three children, two of whom are U.S. citizens and one of is legally present under DACA.

The government also argues that the public interest favors Perez-Perez's detention because "enforcement of the United States' immigration laws is significant."  The government insists that "the public interest is best served by allowing immigration facilities to follow the orderly medical processes and protocols implemented by government professionals, as ICE has been doing.  But that argument ignores the failure to engage in broad-based testing as recommended by the CDC and the lack of measures to eliminate person-to-person contact that has been ordered by government officials across the country.  And when the petitioner's "continued detention is in violation of the United States Constitution," section 1226 "must give way."  *Malam*, 2020 WL 1672662, at *13.

IV.

For the reasons stated above, the Court will construe the petitioner's motion for a temporary restraining order as a motion for a preliminary injunction.  The relevant factors, on balance, favor granting the petitioner the relief he requests.

Accordingly, it is **ORDERED** that the petitioner's motion for a temporary restraining order, construed as a motion for a preliminary injunction (ECF No. 11) is **GRANTED IN PART**.

It is further **ORDERED** that respondent Adducci release the petitioner, Roderico Filadelfo Perez-Perez, on May 10, 2020, on his own recognizance.  The petitioner will be subject to the following restrictions: (1) he is subject to fourteen days of home quarantine; (2) he must comply with all Michigan Executive Orders; and (3) he must appear at all hearings pertaining to his removal proceedings, should the order withholding removal be reversed or modified by the Board of Immigration Appeals.

It is further **ORDERED** that the respondents are further **RESTRAINED AND ENJOINED** from arresting the petitioner for civil immigration detention purposes until the State of Emergency in Michigan (related to COVID-19) is lifted or until further Court Order stating otherwise.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  May 9, 2020